JUSTICE TRIEWEILER
delivered the Opinion of the Court.
¶1 This matter was previously before the Court in Dorwart v. Caraway, 1998 MT 191, 290 Mont. 196, 966 P.2d 1121 (Dorwart I)There, we held that the Plaintiffs’ state constitutional rights to due process, privacy and the right to be free from unreasonable searches and seizures were violated. We remanded to the District Court for the Twenty Second Judicial District in Stillwater County for further consideration of the Plaintiffs’ claims for damages and attorney’s fees caused by the violation of those rights. Both parties filed motions for summary judgment. The District Court held that a private right of action is available for the violation of the state constitutional rights to privacy and to be free from unreasonable searches and seizures and that damages are recoverable. However, the Court also held that the Defendants were entitled to immunity pursuant to § 2-9-103(1), MCA, for having reasonably relied on the previous law of Montana. Therefore, the District Court granted summary judgment to the Defendants, dismissed the Plaintiffs’ claims for damages and denied Plaintiffs’ claims for attorney’s fees. Plaintiffs appeal the District Court’s order dismissing their complaint by summary judgment. Defendants cross-appeal the District Court’s conclusion that there exists in Montana a cause of action and claim for damages for violation of state constitutional rights. We affirm in part and reverse in part the order and judgment of the District Court.
¶2 The issues on appeal are:
¶3 1. Does violation of rights guaranteed by the Montana Constitution give rise to a cause of action for damages?
¶4 2. If the answer to the previous question is in the affirmative, did the Defendants have statutory immunity based on the facts in this case pursuant to § 2-9-103(1), MCA?
¶5 3. If there is a cause of action for damages caused by violation of those rights guaranteed by the state constitution, and if Defendants in this case were not immune pursuant to § 2-9-103(1), MCA, should this Court create qualified immunity analogous to federal qualified immunity as applied in claims pursuant to 42 U.S.C. § 1983, and, if so, were Defendants in this case entitled to summary judgment on that *5 basis?
¶6 4. Did the District Court err when it denied Plaintiffs’ claim for an award of attorney's fees?
FACTUAL BACKGROUND
¶7 The following facts are taken, in part, from our prior decision in Dorwart I and are, in part, based on farther discovery completed following remand by this Court to the District Court.
¶8 The Plaintiff, Russell Dorwart, was named as a defendant in two separate Stillwater County Justice Court actions. Default judgments were entered against him in both actions and writs of execution were issued to enforce those judgments on March 12 and April 9, 1991, respectively.
¶9 On the evening of April 11, 1991, while operating his motor vehicle, Russell Dorwart was stopped by the Defendant, Deputy Sheriff Danny Ames, and served with the two writs of execution. Ames also arrested Dorwart for driving under the influence of alcohol, seized the pickup truck and transported Dorwart to the Stillwater County Jail. After Dorwart was incarcerated in the jail, either Ames or the Defendant, Deputy Sheriff Paul Caraway, advised Dorwart that the two of them were going to his home to seize property pursuant to the writs of execution. They were advised by Dorwart that the only unlocked door was the back door but that they should be careful not to let his cat out when they entered his home. Dorwart also advised the deputies that his wallet and driver’s license were on the dashboard of his mother’s car, which was parked in his driveway. Although the deputies claim to have interpreted Dorwart’s remarks as permission to enter his home, they did not directly ask his permission nor did he grant it. Caraway and Ames worked for the Defendant, Stillwater County Sheriff Cliff Brophy.
¶10 Ames and Caraway proceeded to Dorwart’s residence, entered the house and the garage, and seized various items of personal property pursuant to the writs of execution. They also took Dorwart’s wallet from the dashboard of the car.
¶11 In depositions taken, subsequent to remand, Caraway testified that he believed he had authority to enter Dorwart’s house based on his conversation with Dorwart, his conversation with Justice of the Peace, Marilyn Kober, and the writ of execution that Kober issued. However, he conceded that Kober’s only order was the writ of execution she issued and all he was otherwise told by her was that he should go to Dorwart’s house to seize his property. He conceded that his conversation with Dorwart occurred while Dorwart was in jail and *6 that after he or Ames told Dorwart they were going to his house to seize property, he was simply told to use the back door because the other doors were locked and to be careful that the cat did not get out. Caraway realized that his oral conversation with Kober was not by itself sufficient to authorize entry into a home, he had no warrant to enter Dorwart’s home, and he agreed that the writ of execution did not specifically authorize him to enter Dorwart’s residence and search it.
¶12 Ames testified that he believed he was authorized to enter Dorwart’s home pursuant to the writs of execution and based on his conversation with Dorwart. However, he also acknowledged that the writs did not specifically provide that he could enter the house and that the only thing he was told by Dorwart was to use the back door and not let the cat out after Dorwart had been advised that the deputies were going to his house to seize property. Both Caraway and Ames testified that upon entry into Dorwart’s home, neither made any effort to distinguish between exempt and nonexempt property.
¶13 Dorwart’s pickup truck, its contents and his wallet were returned to him several days later. On April 18,1991, Dorwart filed in Justice Court a Motion for Release of Property and to Quash the Writs of Execution, supported by an Affidavit of Exemption and other affidavits, asserting that the personal property which Ames and Caraway had seized from his house and garage was either exempt from execution or did not belong to him. On September 30,1991, the Justice Court ordered that all of the property seized from Dorwart’s house and garage be returned to its rightful owners. Dorwart subsequently retrieved the property from the jail.
PROCEDURAL HISTORY
¶14 On April 5, 1993, the Plaintiffs, Russell Dorwart and Harry Dorwart, filed a complaint in which Caraway, Ames, Brophy and the County of Stillwater were named as defendants. The Plaintiff Harry Dorwart owned the home in which Russell resided.
¶15 Plaintiffs alleged that Caraway and Ames unlawfully entered Russell’s residence where they conducted an unlawful and unreasonable search and seizure of his property, trespassed, invaded his privacy, wrongfully converted his property, and violated his right to due process of law. It alleged that Brophy and Stillwater County were vicariously liable, for the deputies’ conduct and for grossly negligent supervision of the deputies.
¶16 The Plaintiffs’ complaint set forth claims for damages based on the Defendants’ alleged violations of Article II, Sections 10 (right to privacy), 11 (right to be free from unreasonable searches and seizures), *7 and 17 (right to due process) of the Montana Constitution. They also claimed damages pursuant to 42 U.S.C. § 1983 for violation of their rights guaranteed by the Fourth and Fourteenth Amendments to the United States Constitution and alleged a right to damages for common law trespass and conversion. Plaintiffs claim they were entitled to the recovery of attorney’s fees as part of both their federal and state causes of action. Dorwarts’ complaint was subsequently amended to state claims for declaratory judgment that Montana’s post-execution statutes were in violation of state and federal rights to due process of law.
¶17 On August 7, 1995, the District Court entered its first order granting summary judgment. That order was the subject of our decision in Dorwart I. It concluded that Montana’s postjudgment execution statutes did violate Russell Dorwart’s right to due process of law but that the deputies had committed neither trespass nor conversion, nor had they violated Dorwart’s constitutional rights to privacy or to be free from unreasonable searches and seizures. Finally, the District Court held that although Dorwart’s right to due process of law had been violated, the deputies were entitled to qualified immunity pursuant to Harlow v. Fitzgerald (1982), 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396, and neither Brophy nor Stillwater County were liable pursuant to 42 U.S.C. § 1983. Dorwart’s claims for attorney’s fees were also denied.
¶18 In Dorwart I, we held that because Caraway and Ames did not have a search warrant, Dorwart did not consent to their entry of his home, and there were no exigent circumstances nor any other established exception to the search warrant requirement, the deputies’ entry into Dorwart’s home and seizure of his property violated his right to be free from unreasonable searches and seizures pursuant to Article II, Section 11 of the Montana Constitution. Dorwart I, ¶ 27. We also specifically held that neither the writs of execution themselves nor Montana’s postjudgment execution statutes pursuant to which the writs were issued expressly directed or authorized the deputies to enter Dorwart’s home to effectuate seizure of his property. Dorwart I, ¶¶ 33, 48 and 52.
¶19 We held that the District Court erred when it concluded that the deputies’ entry into Dorwart’s home did not violate his right to privacy guaranteed by Article II, Section 10 of the Montana Constitution, and held that because the District Court had erroneously concluded that Dorwart’s right to privacy and to be free from unreasonable searches and seizures had not been violated, its consideration of Dorwart’s claims for those violations had terminated prematurely. Dorwart I, ¶¶ *8 60-61. We, therefore, remanded for further proceedings to consider those state constitutional claims. Dorwart I, ¶ 61.
¶20 We also held that because Montana law in Title 25, Chapter 13, Part 6, of the Montana Code Annotated provides that certain property is exempt from execution to enforce a judgment, Montana debtors have a property interest in those statutory exemptions protected by the due process guarantees of the Montana Constitution found at Article II, Section 17 (Dorwart I, ¶ 75); and that Montana’s post-execution statutes violated Dorwart’s right to due process because they did not provide him notice of the seizure of his property, of the availability of statutory exemptions from execution, of where to locate additional information about exemptions, of the procedures by which to claim his exemptions, and because he was not provided with a prompt hearing at which to claim his property exempt from execution. Dorwart I, ¶ 103. However, after concluding that Dorwart’s state constitutional right to due process had been violated, we mistakenly omitted remanding to the District Court for further consideration of that claim.
¶21 Finally, a majority of this Court concluded that at the time of Ames’ and Caraway’s entry into Dorwart’s home to execute on his property, the law regarding his constitutional rights to privacy, to be free from searches and seizures and to due process as it interrelated with the law regarding postjudgment execution, had not been clearly established. Therefore, we affirmed the District Court’s summary dismissal of Dorwart’s claims for common law trespass and conversion, for damages pursuant to 42 U.S.C. § 1983, and for attorney’s fees. Dorwart I, ¶¶ 112, 120, 126 and 132.
¶22 In conclusion, we stated:
Thus, we conclude that Dorwart’s arguments regarding entitlement to attorney’s fees on his claims under Article II, Sections 10 and 11 of the Montana Constitution must be remanded in conjunction with our remand of those constitutional claims for further proceedings.
Dorwart I, ¶ 134.
¶23 However, because Dorwart has at all times claimed violations of not just Article II, Sections 10 and 11, but also Article II, Section 17, and because our prior opinion established violations of all three sections to the Montana Constitution, our remand should properly have included consideration of Dorwart’s claim for violation of his right to due process guaranteed by Article II, Section 17.
¶24 Following remand to the District Court, all parties again moved for summary judgment. In support of the Defendants’ motion, the Defendants contended that there is no authority to support a private *9 action for damages based on violations of the Montana Constitution and that if a direct cause of action is authorized, Defendants are entitled to either qualified immunity analogous to that which is provided for violations of federal civil rights, or statutory immunity pursuant to § 2-9-103(1), MCA. Defendants contended that Dorwart is not entitled to attorney’s fees for the same reason that he was not entitled to attorney’s fees for violation of his federal civil rights.
¶25 Plaintiffs contended that they are entitled to claim damages for violation of their state constitutional rights based on the Restatement of Torts, the U.S. Supreme Court’s decision in Bivens v. Six Unknown Fed. Narcotics Agents (1971), 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619, and based upon the English Common Law as interpreted in numerous other states.
¶26 In a thoughtful and comprehensive order and memorandum entered by the District Court on November 17,2000, the District Court concluded after consideration of various authorities that plaintiffs in general are entitled to bring a claim for money damages based on the violation of their state constitutional rights but that in this case, Defendants had acted in reliance on the law as it existed at the time of their conduct and were, therefore, entitled to statutory immunity pursuant to § 2-9-103(1), MCA. Because it held that Defendants were entitled to immunity pursuant to statutory law, the Court did not extensively discuss the common law concept of qualified immunity and did not determine whether it applied in this case. Pursuant to the general rule that prevailing parties in civil actions are not entitled to attorney’s fees absent a contractual agreement or expressed statutory authority and because neither was found in this case and no special circumstances were found to exist, attorney’s fees were denied.
¶27 Both parties appeal. We affirm in part and reverse in part the order and judgment of the District Court.
STANDARD OF REVIEW
¶28 Our standard of review of a district court’s order granting summary judgment is de novo; we apply the same criteria pursuant to Rule 56, M.R.Civ.P., that controls the district court’s decision. Clark v. Eagle Systems, Inc. (1996), 279 Mont. 279, 283, 927 P.2d 995, 997 (citations omitted). A party seeking summary judgment must establish the absence of any genuine issue of material fact which would allow the nonmoving party to recover an entitlement to judgment as a matter of law. Rule 56(c), M.R.Civ.P.; Clark, 279 Mont. at 283, 927 P.2d at 997-98.
¶29 Here, in spite of additional discovery subsequent to our remand, *10 the material facts are still undisputed and the issues on appeal relate solely to how the law applies to those facts. We review a district court’s conclusions of law to determine whether those conclusions are correct. Albright v. State, By and Through State (1997), 281 Mont. 196, 205, 933 P.2d 815, 821 (citation omitted).
DISCUSSION
ISSUE 1
¶30 Does violation of rights guaranteed by the Montana Constitution give rise to a cause of action for damages?
¶31 By 1998, twenty-one states had recognized an implied cause of action for state constitutional violations. Three additional states had indicated that they would do so under certain narrow circumstances. A private cause of action has been recognized in a twenty-fifth state by federal courts and four states have enacted statutes which authorize causes of action for violation of state constitutional rights. Seven states have specifically rejected state constitutional causes of action. See Gail Donoghue & Jonathan I. Edelstein, Life After Brown: The Future of State Constitutional Tort Actions in New York, 42 N.Y.L. Sch. L. Rev. 447, 447 n.2 (1998).[1] Furthermore, the majority of legal scholarship on the topic of state constitutional tort actions has favored an expansive *11 right of action. 42 N.Y.L. Sch. L. Rev. at 450 n.12. The analytical framework for consideration of claims for violation of state constitutions varies from state to state. However, any discussion of a claim for violation of constitutional rights begins with Bivens.
¶32 In Bivens, the plaintiff complained that federal narcotics agents entered his apartment, arrested him, manacled him in front of his family, and threatened to arrest his entire family. He was then taken to a federal courthouse where he was interrogated, booked, and subjected to a visual strip search. He filed a complaint for damages for his warrantless search and arrest and for the agents’ unreasonable use of force. That complaint was dismissed by the district court. The dismissal was affirmed by the Second Circuit Court of Appeals. However, the U.S. Supreme Court granted certiorari and reversed the dismissal. On appeal, the defendant federal agents contended, as do the Defendants in this case, that Bivens’ exclusive remedy should be pursuant to state tort law. They contended that because he had a state tort remedy, there was no need for a cause of action to vindicate his constitutional rights. The Supreme Court disagreed and distinguished common law torts from the violation of constitutional rights. In language repeatedly cited by state courts considering the same issues, the Court stated:
Respondents seek to treat the relationship between a citizen and a federal agent unconstitutionally exercising his authority as no different from the relationship between two private citizens. In so doing, they ignore the fact that power, once granted, does not disappear like a magic gift when it is wrongfully used. An agent acting-albeit unconstitutionally-in the name of the United States possesses a far greater capacity for harm than an individual trespasser exercising no authority other than his own. Accordingly, as our cases make clear, the Fourth Amendment operates as a limitation upon the exercise of federal power regardless of whether the State in whose jurisdiction that power is exercised would prohibit or penalize the identical act if engaged in by a private citizen. It guarantees to citizens of the United States the absolute right to be free from unreasonable searches and seizures carried out by virtue of federal authority. And ‘where federally protected rights have been invaded, it has been the rule from the beginning that courts will be alert to adjust their remedies so as to grant the necessary relief.’ [Citations omitted.]
Bivens, 403 U.S. at 391-92, 91 S.Ct. at 2002.
¶33 The Court proceeded to make the following distinction between those interests protected by state laws regulating trespass and those *12 protected by the constitutional right to be free from unreasonable searches and seizures:
The interests protected by state laws regulating trespass and the invasion of privacy, and those protected by the Fourth Amendment’s guarantee against unreasonable searches and seizures, may be inconsistent or even hostile. Thus, we may bar the door against an unwelcome private intruder, or call the police if he persists in seeking entrance. The availability of such alternative means for the protection of privacy may lead the State to restrict imposition of liability for any consequent trespass. A private citizen, asserting no authority other than his own, will not normally be liable in trespass if he demands, and is granted, admission to another’s house. But one who demands admission under a claim of federal authority stands in a far different position. The mere invocation of federal power by a federal law enforcement official will normally render futile any attempt to resist an unlawful entry or arrest by resort to the local police; and a claim of authority to enter is likely to unlock the door as well. Tn such cases there is no safety for the citizen, except in the protection of the judicial tribunals, for rights which have been invaded by the officers of the government, professing to act in its name. There remains to him but the alternative of resistance, which may amount to crime.’ [Citations omitted.]
Bivens, 403 U.S. at 394-95, 91 S.Ct. at 2003-04.
¶34 The Supreme Court held that while the Fourth Amendment did not expressly provide for its enforcement by an award of money damages for its violation, “[hjistorically, damages have been regarded as the ordinary remedy for an invasion of personal interests in liberty. . . . [F]ederal courts may use any available remedy to make good the wrong done.” Bivens, 403 U.S. at 395-96, 91 S.Ct. at 2004 (citations omitted).
¶35 The Supreme Court held that:
Having concluded that petitioner’s complaint states a cause of action under the Fourth Amendment, supra, at 2001-2004, we hold that petitioner is entitled to recover money damages for any injuries he has suffered as a result of the agents’ violation of the Amendment.
Bivens, 403 U.S. at 397, 91 S.Ct. at 2005.
¶36 Subsequently the Supreme Court has held that money damages can be recovered for violations of the Fifth Amendment’s guarantee of due process and the Eighth Amendment’s prohibition against cruel and unusual punishment. See Davis v. Passman (1979), 442 U.S. 228, 99 *13 S.Ct. 2264, 60 L.Ed.2d 846, and Carlson v. Green (1980), 446 U.S. 14, 100 S.Ct. 1468, 64 L.Ed.2d 15, respectively.
¶37 The general principle of Bivens and its progeny is set out clearly in Restatement (Second) of Torts § 874A (1979), which provides:
When a legislative provision protects a class of persons by proscribing or requiring certain conduct but does not provide a civil remedy for the violation, the court may, if it determines that the remedy is appropriate in furtherance of the purpose of the legislation and needed to assure the effectiveness of the provision, accord to an injured member of the class a right of action, using a suitable existing tort action or a new cause of action analogous to an existing tort action.
¶38 Section 874A, comment a, makes clear that the term “legislative provision” includes a constitutional provision.
¶39 In those states which have considered and permitted a claim for damages for violation of state constitutional rights, various analytical models have been employed. In Vermont, the state supreme court used a two-step inquiry by which it first considered whether the provisions at issue were self-executing and, if so, whether monetary damages should be available as a remedy for a violation. It held that a general provision guaranteeing a right to enjoy life was not self-executing but that the specific guarantee of right to free speech was self-executing and after considering Bivens and the Restatement, held that it may be appropriate to allow monetary damages for violation of constitutional rights where the legislature has fashioned no other adequate remedial scheme. See Shields v. Gerhart (Vt. 1995), 658 A.2d 924, 934.
¶40 In Widgeon v. Eastern Shore Hosp. Center (Md. 1984), 479 A.2d 921, the Maryland Court of Appeals considered whether the plaintiff could recover damages for the violation of his state rights to due process and to be free from unreasonable searches and seizures. The court gave little consideration to the Vermont Supreme Court’s two-part analysis but did consider significant that state’s constitutional provision for application of the common law of England. It noted that:
Under the common law of England, where individual rights, such as those now protected by Article 26 [to be free from unreasonable searches and seizures], were preserved by a fundamental document (e.g., the Magna Carta), a violation of those rights generally could be remedied by a traditional action for damages. The violation of the constitutional right was viewed as a trespass, giving rise to a trespass action.
Widgeon, 479 A.2d at 924.
¶41 Based on the historical precedent established by the English *14 Common Law and the Maryland court’s consideration of the U.S. Supreme Court’s decision in Bivens, that court held that when a person is deprived of the constitutional rights at issue in that case, those rights may be enforced by bringing a common law action for damages. Widgeon, 479 A.2d at 929. In response to the defendant’s contention that because plaintiff had available to him remedies under state tort law, a cause of action for violation of constitutional rights should not be recognized, the Maryland court stated:
It is a well-settled rule, however, that where a particular set of facts gives rise to alternative causes of action, they may be brought together in one declaration, and where several remedies are requested, an election is not required prior to final judgment. Additionally, under some circumstances, a state constitutional provision may recognize and preserve an interest that is wholly unprotected under state common law and statutes. Thus, the existence of other available remedies, or a lack thereof, is not a persuasive basis for resolution of the issue before us. [Citations omitted.]
Widgeon, 479 A.2d at 928-29.
¶42 In Moresi v. Department of Wildlife & Fisheries (La. 1990), 567 So.2d 1081, the Supreme Court of Louisiana concluded that the plaintiff in that case could bring a cause of action for damages for violation of his state constitutional right to privacy and to be free from unreasonable searches and seizures. That court based its decision on Bivens and the previously cited English Common Law. Courts in Utah and New York, following the two-part analysis employed in Vermont, have concluded the state constitutional rights in those states to be free from cruel and unusual punishment, equal protection and the right to be free from unreasonable searches and seizures are self-executing and that based on the English Common Law and Bivens, damages for violations of those state constitutional rights are recoverable. See Bott v. DeLand (Utah 1996), 922 P.2d 732, limited by Spackman ex rel. Spackman v. Board of Educ. (Utah 2000), 16 P.3d 533; Brown v. State (N.Y. 1996), 674 N.E.2d 1129.
¶43 More recently, the State of Connecticut has arrived at the same conclusion based on Bivens and the Restatement. See Binette v. Sabo (Conn. 1998), 710 A.2d 688. The Connecticut decision provides an excellent summary of how other states had resolved this issue by 1998. See Binette, 710 A.2d at 696-97. The Connecticut court also distinguished constitutional torts from common law torts such as assault, trespass or conversion. It stated:
The difference in the nature of the harm arising from a beating *15 administered by a police officer or from an officer’s unconstitutional invasion of a person’s home, on the one hand, and an assault or trespass committed against one private citizen by another, on the other hand, stems from the fundamental difference in the nature of the two sets of relationships. A private citizen generally is obliged only to respect the privacy rights of others and, therefore, to refrain from engaging in assaultive conduct or from intruding, uninvited, into another’s residence. A police officer’s legal obligation, however, extends far beyond that of his or her fellow citizens: the officer not only is required to respect the rights of other citizens, but is sworn to protect and defend those rights. In order to discharge that considerable responsibility, he or she is vested with extraordinary authority. Consequently, when a law enforcement officer, acting with the apparent imprimatur of the state, not only fails to protect a citizen’s rights but affirmatively violates those rights, it is manifest that such an abuse of authority, with its concomitant breach of trust, is likely to have a different, and even more harmful, emotional and psychological effect on the aggrieved citizen than that resulting from the tortious conduct of a private citizen.
Binette, 710 A.2d at 698.
¶44 We conclude that the Bivens line of authority buttressed by § 874A of the Restatement (Second) of Torts are sound reasons for applying a cause of action for money damages for violations of those self-executing provisions of the Montana Constitution. We also conclude that those rights protected by Article II, Sections 10,11 and 17 of the Montana Constitution are self-executing based on the same analysis employed by the Supreme Court of Vermont in Shields. We conclude that this result is further compelled by our own statutory law and, in particular, §§ 1-1-109 and 27-1-202, MCA. Section 1-1-109, MCA, provides that:
The common law of England, so far as it is not repugnant to or inconsistent with the constitution of the United States or the constitution or laws of this state, is the rule of decision in all the courts of this state.
Section 27-1-202, MCA, provides that:
Every person who suffers detriment from the unlawful act or omission of another may recover from the person in fault a compensation therefor in money, which is called damages.
¶45 Either statute standing alone reinforces our decision based on the legislative policy of this state. However, when considered together, and *16 with the right found at Article II, Section 16 of the Montana Constitution to a remedy for every injury, this body of statutory and constitutional law permits no other result.
¶46 The Defendant and Amicus Curia, Montana Defense Trial Lawyers Association, urge that already available common law tort remedies such as conversion and trespass are adequate remedies for the conduct alleged by the Plaintiffs and, therefore, a cause of action for violation of the Montana Constitution should not be authorized. However, we agree with the previous authorities that there is a great distinction between wrongs committed by one private individual against another and wrongs committed under authority of the state. Common law causes of action intended to regulate relationships among and between individuals are not adequate to redress the type of damage caused by the invasion of constitutional rights.
¶47 Finally, Defendants claim that this issue has been resolved in Irving v. School Dist. No. 1-1A (1991), 248 Mont. 460, 813 P.2d 417. However, Irving is clearly distinguishable. There, we held as a matter of law that there was no damage from a school board’s violation of Montana’s open meeting law found at Article II, Section 9 of the Montana Constitution because the Legislature had provided a remedy pursuant to § 2-3-213, MCA, which would have voided action taken at a closed meeting and no effort had been made by the plaintiff to do so. Irving, 248 Mont. at 465, 813 P.2d at 420. We held that plaintiffs damages did not arise from closure of the meeting but from action taken at the meeting which could have been invalidated. Irving, 248 Mont. at 465, 813 P.2d at 420. Any additional language about the constitutional claim being duplicative of a claim made pursuant to 42 U.S.C. § 1983 was unnecessary to the decision and was merely dicta.
¶48 For these reasons, we conclude that the District Court correctly held that a cause of action for money damages is available for violation of those rights guaranteed by Article II, Sections 10 and 11 of the Montana Constitution. In addition, we conclude that a direct cause of action for money damages is available for violation of the Plaintiffs’ rights guaranteed by Article II, Section 17 of the Montana Constitution, and remand for further consideration of the Plaintiffs’ claims for damages pursuant to all three sections of Article II.
ISSUE 2
¶49 Did the Defendants have statutory immunity based on the facts in this case pursuant to § 2-9-103(1), MCA?
¶50 Section 2-9-103(1), MCA, provides as follows:
If an officer, agent, or employee of a governmental entity acts *17 in good faith, without malice or corruption, and under the authority of law and that law is subsequently declared invalid as in conflict with the constitution of Montana or the constitution of the United States, neither he nor any other officer or employee of the governmental entity he represents nor the governmental entity he represents is civilly liable in any action in which he, such other officer, or such governmental entity would not have been liable had the law been valid. [Emphasis added.]
¶51 The District Court held that because Ames and Caraway acted in rebanee on the law (citing Ramsey v. Burns (1902), 27 Mont. 154, 69 P. 711, and Boyd v. United States (1886), 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746) and because neither acted with “malice or corruption,” all Defendants were entitled to immunity as a matter of law pursuant to § 2-9-103(1), MCA. The problem with the District Court’s analysis is twofold. First, Caraway and Ames, based on their own testimony, did not rely on anything they assumed to be true based on Ramsey or Boyd. They relied on the writ of execution and on Dorwart’s admonishment to use the back door and not let the cat out. Second, we did not conclude that postjudgment execution statutes were unconstitutional for authorizing entry into Dorwart’s home. We held that there was nothing in the writ of execution or the statutes pursuant to which they were issued which did authorize entry into Dorwart’s home. Neither was there any language in the writ of execution nor in the execution statutes which authorized seizure of nonexempt property owned by Dorwart or others. We specifically stated:
Here, neither the writs of execution themselves, nor the post-judgment execution statutes pursuant to which the writs were issued, expressly directed or authorized the deputies to enter Dorwart’s private residence to effectuate the seizure of his property.
Moreover, nothing in the post-judgment execution statutes expressly authorizes the entry into a private home for the purposes of executing a writ of execution. While the execution statutes authorize the levy on-or “seizure” of-a judgment debtor’s personal property pursuant to a writ of execution, they do not authorize officials to enter private homes to search for that property. [Citations omitted.]
Dorwart I, ¶¶ 33, 48.
¶52 Therefore, Caraway and Ames did not enter Dorwart’s home and seize nonexempt property pursuant to a statute which has since *18 been held unconstitutional. The execution statute pursuant to which they entered the home did not authorize their entry in the first place and did not authorize their seizure of nonexempt property. For these reasons, we conclude that § 2-9-103(1), MCA, is inapplicable to their conduct and they were not provided with statutory immunity. However, we also conclude that to the extent any claim for damages for violation of Dorwart’s right to due process is based on a failure to provide him with the notice of exempt property and a timely hearing required by our prior decision, those claims are a result of the execution statutes’ constitutional inadequacy and recovery for those procedural inadequacies is barred by the statutory immunity provided by § 2-9-103(1), MCA. The District Court’s dismissal of the Plaintiffs’ claims based on statutory immunity is otherwise reversed.
ISSUE 3
¶53 Should this Court create qualified immunity analogous to federal qualified immunity as applied in claims pursuant to 42 U.S.C. § 1983, and, if so, were Defendants in this case entitled to summary judgment on that basis?
¶54 Damages may be recovered for violation of federal constitutional rights pursuant to 42 U.S.C. § 1983. That section provides that:
Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress ....
¶55 However, in Harlow, the Supreme Court held that qualified or good faith immunity is sometimes necessary to balance the competing values of damages for violation of a constitutional right and the vigorous exercise of official authority. The Court held that:
[GJovemment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. [Citations omitted.]
Harlow, 457 U.S. at 818, 102 S.Ct. at 2738.
¶56 We applied qualified immunity to bar the Plaintiffs’ claims based on § 1983 in Dorwart I. There we held that the law on which Dorwart relied in asserting his federal claim was not clearly established at the time that it was violated. Caraway and Ames were entitled to qualified *19 immunity for Dorwart’s § 1983 search and seizure claim. Dorwart I, ¶ 112.
¶57 Defendants contend that they are also entitled to qualified immunity from liability for violation of the Plaintiffs’ state constitutional rights. They contend that other state courts have so held and cite as examples Moressi; Jenness v. Nickerson (Me. 1994), 637 A.2d 1152; Duarte v. Healy (Mass. 1989), 537 N.E.2d 1230; and numerous federal decisions. Defendants and Amicus Curia, Montana Defense Trial Lawyers Association, contend that the same policy considerations which justify the application of qualified immunity to damage claims for violation of federal constitutional rights should apply to claims for violation of state constitutional rights and that because the issue of qualified immunity has been previously determined in the Defendants’ favor, they are entitled to have the District Court’s summary judgment affirmed.
¶58 Dorwarts contend that this Court should decline to follow the federal law regarding qualified immunity because it would lead to a procedural quagmire, reward ignorance of constitutional rights and detract from efficiency in resolving constitutional claims.
¶59 In amicus briefs filed by Wade Dahood, Chairman of the Bill of Rights Committee of the 1972 Montana Constitutional Convention, and the Montana Trial Lawyers Association, Amici contend that the adoption of qualified immunity in Montana would ignore fundamental differences between federal law and our state constitution. They contend that the federal government has reserved sovereign immunity except to the extent that it is waived, citing United States v. Mitchell (1980), 445 U.S. 535, 538, 100 S.Ct. 1349, 1351, 63 L.Ed.2d 607, but that the Montana Constitution abolishes sovereign immunity except to the extent that it is readopted by two-thirds of the Legislature, citing Article II, Section 18 of the Montana Constitution. They contend that federal qualified immunity is a common law construct arising from the long tradition of sovereign immunity as recognized by the Supreme Court in Richardson v. McKnight (1997), 521 U.S. 399, 117 S.Ct. 2100, 138 L.Ed.2d 540.
¶60 Although most state courts which have considered the issue have followed the federal law of qualified immunity, not all have done so. In Clea v. City Council of Baltimore (Md. 1988), 541 A.2d 1303, 1314, the Maryland Court of Appeals rejected qualified immunity as a defense to violations of the Maryland Constitution with the following explanation:
On the other hand, constitutional provisions like Articles 24 or 26 of the Maryland Declaration of Rights, or Article III, § 40, of the *20 Maryland Constitution, are specifically designed to protect citizens against certain types of unlawful acts by government officials. To accord immunity to the responsible government officials, and leave an individual remediless when his constitutional rights are violated, would be inconsistent with the purpose of the constitutional provisions. It would also, as frankly recognized by counsel for Officer Leonard in this Court, largely render nugatory the cause of action for violation of constitutional rights recognized in Widgeon, Mason, Heinze, Weyler, and other cases.
¶61 While we agree with the Maryland Court of Appeals, we find more compelling the historical basis for federal immunity and our own constitutional provisions which eliminate governmental immunity and protect access to our courts.
¶62 In Mitchell, 445 U.S. at 538, 100 S.Ct. at 1351, the Supreme Court stated that:
It is elementary that “[t]he United States, as sovereign, is immune from suit save as it consents to be sued..., and the terms of its consent to be sued in any court define that court’s jurisdiction to entertain the suit.” A waiver of sovereign immunity “cannot be implied but must be unequivocally expressed.” In the absence of clear congressional consent, then, “there is no jurisdiction in the Court of Claims more than in any other court to entertain suits against the United States.” [Citations omitted.]
¶63 The Supreme Court has also explained the difference between qualified immunity and a defense to a claim on the merits as well as the deeply rooted common law traditions for immunity at a federal level in Richardson. In Richardson, the Court was presented with the question of whether qualified immunity could be applied to bar claims by Tennessee prisoners who claimed to have been injured by guards at a private prison. The Court held that prison guards employed by a private firm are not entitled to a qualified immunity from suit by prisoners charging a § 1983 violation. Richardson, 521 U.S. at 412, 117 S.Ct. at 2108.
¶64 In Richardson, 521 U.S. at 403, 117 S.Ct. at 2103, the Court explained that “a distinction exists between an ‘immunity from suit’ and other kinds of legal defenses.... [A] legal defense may well involve ‘the essence of the wrong,’ while an immunity frees one who enjoys it from a lawsuit whether or not he acted wrongly.” It concluded that while immunity for a government employee is deeply rooted in the common law there is no comparable tradition of immunity applicable to privately employed prison guards.
*21 ¶65 Likewise, there is no comparable immunity found in Montana for the acts of state employees in violation of state constitutional rights. In fact, contrary to the federal presumption of immunity, the Montana State Constitution at Article II, Section 18, prohibits immunity in the following language:
The state, counties, cities, towns, and all other local governmental entities shall have no immunity from suit for injury to a person or property, except as may be specifically provided by law by a two-third vote of each house of the legislature.
¶66 We need not decide in this case whether by a two-thirds vote of the Legislature qualified immunity can in fact be created which would render unenforceable other provisions of the same constitution. The Legislature clearly has not done so and that argument is not before us.
¶67 Furthermore, Article II, Section 16 of the Montana Constitution provides that “[cjourts of justice shall be open to every person, and speedy remedy afforded for every injury of person, property, or character.”
¶68 As pointed out in Richardson, qualified immunity is not a defense to the merits of a claim but frees a wrongdoer from liability whether or not he or she acted wrongly. Therefore, the adoption of qualified immunity in Montana would also be inconsistent with the constitutional requirement that courts of justice afford a speedy remedy for those claims recognized by law for injury of person, property or character.
¶69 For these reasons, we conclude that qualified immunity, as established by federal law and applied by this Court in Dorwart I, to bar those claims filed by plaintiffs pursuant to 42 U.S.C. § 1983 is not applicable to those claims filed by the Plaintiffs for violation of those rights guaranteed by the Montana State Constitution.
ISSUE 4
¶70 Did the District Court err when it denied Plaintiffs’ claim for an award of attorney’s fees?
¶71 Dorwarts contend that the violation of their state constitutional rights entitled them to an award of attorney’s fees in addition to whatever damages might be proven and recoverable. In support of that argument, Plaintiffs contend that attorney’s fees are recoverable in successful claims pursuant to 42 U.S.C. § 1983 and that fees are necessarily recoverable for vindication of state constitutional rights by analogy and because the cost of bringing a claim might otherwise outweigh the expected benefits. Prior to oral argument, Plaintiffs did not claim nor brief their entitlement to attorney’s fees pursuant to the *22 private attorney general theory which we adopted in School Trust v. State ex rel. Bd. of Com’rs, 1999 MT 263, ¶ 67, 296 Mont. 402, ¶ 67, 989 P.2d 800, ¶ 67. Therefore, we will not consider Plaintiffs’ claim for attorney's fees on that basis.
¶72 The Defendants contend that an award of attorney’s fees under the circumstances in this case would be unjust for the reasons set forth in Dorwart I. Amicus Curia, Montana Defense Trial Lawyers Association, contends that it is a legislative responsibility to determine when fees are recoverable and it has not created a right for the recovery under the circumstances in this case.
¶73 The District Court concluded that:
The general rule in Montana is that “the prevailing party in a civil action may not recover attorney’s fees absent a contractual agreement or express statutory authority.” Parker v. Elder (1992), 254 Mont. 270, 271, 836 P.2d 1236, which cited Harris v. Bauer (1988), 230 Mont. 207, 749 P.2d 1068, and Martin v. Crown Life Insurance Co. (1983), 202 Mont. 461, 658 P.2d 1099. There is no contractual agreement providing for attorney’s fees in this case. Plaintiff has not cited any statute providing for attorney's fees.
¶74 The District Court was correct. Based on the issue as it has been framed by the parties’ arguments and the authorities presented to us, we conclude that no authority has been established for an award of attorney’s fees to the Plaintiffs in this case. Therefore, we affirm the District Court’s denial of Plaintiffs’ claim for attorney's fees.
SUMMARY
¶75 We conclude that the rights at issue in this case, Article II, Sections 10,11, and 17 of the Montana Constitution, are self-executing and that pursuant to the English Common Law as adopted by the State of Montana, § 874A of the Restatement (Second) of Torts, and analogous federal law, including Bivens, in combination with the clear intent of those delegates to the Montana Constitution that courts be open for redress of injuries to person, property, or character, that a claim for damages from violation of the specified state constitutional rights can be presented as a cause of action in Montana. We furthermore conclude that § 2-9-103(1), MCA, is not a defense to the Plaintiffs’ claims based on the facts in this case and make no determination about its constitutionality. We conclude that qualified immunity as described by the U.S. Supreme Court in Harlow is not a defense to claims for damages for violation of Montana constitutional rights. And, finally, we conclude that based on the arguments and authorities presented in this case, the Plaintiffs are not entitled to the *23 recovery of attorney’s fees.
¶76 The right to privacy-to be left alone-is precious. It is essential to our quality of life. No one was more aware of that than the authors of our Constitution who went to great and conspicuous lengths to preserve it in the face of what they correctly anticipated would be increasing political pressure and the developing technological ability to erode it.
¶77 Invasion of individual privacy by a fellow citizen is a bad thing. Invasion by the state or its agents is worse. A culture of governmental disregard for the right to privacy would be worst of all. To avoid that possibility in the face of sometimes short-sighted popular and political sentiment will take a vigilant judiciary with a full arsenal of remedies. Today, in recognition of this year’s thirtieth anniversary of our state constitution and those far-sighted delegates who crafted it, we add the cause of action for damages to that arsenal.
¶78 For these reasons, we affirm in part and reverse in part the District Court’s order of summary judgment.
JUSTICES REGNIER, COTTER, LEAPHART and NELSON concur.

 Footnote two provides:
Prior to the New York Court of Appeals’ decision in Brown, 19 states and Puerto Rico recognized an implied cause of action for state constitutional violations prior to the Brown decision. The states in which such a cause of action has been recognized by the highest state court are California, Illinois, Louisiana, Maryland, Michigan, New Jersey, New Mexico, North Carolina, Pennsylvania, Utah, Vermont and West Virginia. Four additional states: Arkansas, Maine, Massachusetts, and Nebraska, have enacted statutes providing private causes of action for violation of state constitutional rights under certain circumstances. Direct causes of action based on the Florida and Wisconsin Constitutions have also been recognized by certain lower courts of those states, but not by either state’s highest court. In addition, subsequent to the court of appeals’ decision in Brown, the Connecticut Supreme Court recognized a private right of action for violations of certain Connecticut constitutional provisions, resolving an issue which had previously been in dispute among the lower courts in that state. See Binette v. Sabo, No. SC-15547, at 3 (Conn.Mar. 10,1998).
Seven states: Colorado, Georgia, Hawaii, Oregon, Tennessee, Texas, and Washington, have specifically rejected state constitutional causes of action. In addition, although the Alaska, New Hampshire, and Ohio courts have never recognized a private state constitutional right of action, they have indicated that they would do so under certain narrow circumstances. Finally, a private right of action has been implied from the Rhode Island Constitution, but only by federal courts. It should be further noted that this list does not include states which have recognized rights of action based upon constitutional provisions requiring just compensation for takings of private property for public use. See infra note 284 and accompanying text (discussing the unique place of just compensation clauses in constitutional tort jurisprudence).