FILED

02/17/2026

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 25-0165

DA 25-0165

IN THE SUPREME COURT OF THE STATE OF MONTANA

2026 MT 26

LAUREN DIFOLCO and SHERRY SPEAR,

      Petitioners and Appellees,

  v.

MONTANA STATE HOSPITAL-DEPARTMENT OF
PUBLIC HEALTH AND HUMAN SERVICES,

      Respondent and Appellant.

APPEAL FROM:   District Court of the Second Judicial District,
In and For the County of Butte-Silver Bow, Cause No. DV-24-17
Honorable Kurt Krueger, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

            Justin Kraske, Staff Attorney, Department of Social and Health
Services, Helena, Montana

      For Appellees:

            Adam Cook, Everett Cook Law, Anaconda, Montana

                        Submitted on Briefs:  December 3, 2025

                                  Decided:  February 17, 2026

Filed:

                             _____
                                  Clerk

Justice Beth Baker delivered the Opinion of the Court.

¶1 Lauren Difolco and Sherry Spear filed sex discrimination claims with the Montana Department of Labor and Industry's Human Rights Bureau after the Montana State Hospital awarded their male coworker, Trent Martin, a promotion. The Hearing Officer found that the Hospital hired Martin based on his interview performance and did not discriminate against Spear and Difolco. The Human Rights Commission (HRC) affirmed. The District Court reversed, concluding that five of the Hearing Officer's factual findings were clearly erroneous. The court awarded damages and attorney fees to Difolco and Spear. The dispositive issue on appeal is whether the District Court exceeded its authority under the Montana Administrative Procedure Act when it reversed the HRC's decision. We reverse the District Court and reinstate the HRC's final agency decision.

**FACTUAL AND PROCEDURAL BACKGROUND**

¶2 In 2019, the Montana State Hospital in Warm Springs, Montana, hired Lauren Difolco and Sherry Spear as recreation therapists. Spear and Difolco had bachelor's degrees in recreation therapy and prior experience as recreation therapists. The Hospital hired Trent Martin as a recreational services aid in May 2020, and he was promoted to recreation therapist seven months later. Martin previously worked as a missionary, an outdoor program coordinator at a youth residential center, a U-Haul and storage facility manager, and a wilderness program field instructor. Martin had neither a bachelor's degree in recreation therapy nor, prior to his promotion at the Hospital, experience as a recreation therapist.

2

¶3     In July 2021, the Hospital sought to hire a Treatment Rehabilitation Manager (TRM), a mid-level management position that oversees the Hospital's rehabilitative program and staff. Justin Lanes, a human resource generalist for the Hospital, created the TRM job posting. It required the following minimum qualifications: (1) a bachelor's degree in rehabilitation therapy or a related field, (2) a minimum of four years of management experience in a psychiatric setting "with work assignments including management of a clinical area and supervision of staff," and (3) Certified Therapeutic Recreation Specialist preferred. Interested applicants were asked to submit the Hospital's online application form along with a resume and cover letter. The job posting contained the following disclaimer: "Candidates will be evaluated to determine if they meet the minimum qualifications listed above and on the extent to which the application materials show the candidate possess[es] the knowledge, skills, and abilities associated with this position . . . . Candidates whose application and supporting documentation . . . do not clearly indicate all minimum qualifications are met will not be considered."

¶4     Five current Hospital employees applied for the TRM position: Lauren Difolco, Sherry Spear, Chad Peterson, Trent Martin, and Jamie Farmer. Lanes screened the applications to determine whether the candidates met the minimum qualifications. Lanes determined that only Peterson was minimally qualified. He recommended that the hiring manager, George Sich, reject the remaining applications and interview Peterson.

¶5     Sich was concerned that Lanes recommended only one candidate for an interview. Because of its frequent limited applicant pools, the Hospital commonly included in job

3

postings the alternative minimum qualification that "[o]ther combinations of experience and education may be considered on a case by case basis." Lanes forgot to include this alternative in the TRM posting, which closed before he could update it. After Sich expressed concern about advancing just one applicant, Lanes applied the alternative (the "catch-all provision") to the existing applicant pool and recommended that the Hospital interview all five.

¶6 George Sich, Jamie Foy, and Holly Callarman conducted the interviews for the TRM position. They asked candidates a series of behavioral-based questions about their leadership and management experience. All three interviewers determined that Martin outperformed the others and that he possessed the leadership skills necessary for the TRM position. The Hospital hired Martin based on the panel's recommendation. Spear and Difolco felt upset and humiliated when they learned that Martin received the position because he lacked their education and experience in recreation therapy.

¶7 Spear and Difolco filed separate complaints with the Human Rights Bureau in September 2021. They alleged that the Hospital discriminated against them on the basis of sex when it hired Martin as TRM because they were qualified for the position and Martin was not.[1] The Hospital denied these allegations, explaining that it hired Martin because he was the most qualified candidate.

---

[1] The complaints also alleged that the Hospital discriminated against the women during the hiring of two other management positions. Spear and Difolco focused on the July 2021 TRM position throughout the proceedings and do not challenge the other hiring decisions on appeal.

¶8 A Hearing Officer was appointed and conducted a consolidated contested case hearing on Spear and Difolco's claims. Spear and Difolco testified, along with Martin, Lanes, Callarman, Sich, and Foy. The Hearing Officer issued his Findings of Fact, Conclusions of Law and Notice of Issuance of Administrative Decision on August 22, 2023. The Officer found that although Spear and Difolco established prima facie cases of sex discrimination,[2] they failed to prove that Martin's interview performance was mere pretext and not the Hospital's legitimate, nondiscriminatory reason for hiring him. Based on these findings, the Hearing Officer concluded that the Hospital did not unlawfully discriminate against Spear and Difolco. Spear and Difolco appealed to the HRC. The HRC determined that the Hearing Officer's findings were supported by substantial evidence and affirmed.[3]

¶9 Difolco and Spear petitioned for judicial review of the HRC's final agency decision in the Second Judicial District Court, Butte-Silver Bow County. Difolco and Spear argued that several administrative findings were not supported by substantial evidence. The District Court agreed and reversed the HRC. The court found that the contested findings were clearly erroneous, that the Hospital's proffered reason for hiring Martin was mere

---

[2] The Hearing Officer stated that, since Spear and Difolco were granted interviews for the position, "it is deemed that they met the minimum qualifications" and thus had carried their initial burden to establish a prima facia case of sex discrimination in relation to the hiring decision for the TRM position.

[3] The HRC found one error in the Hearing Officer's findings. Finding of Fact No. 3 provided that "DiF[o]lco had amassed 27 credit hours towards a therapeutic education degree from Lehman College, but never earned a bachelor's degree." Because the evidence established that Difolco did have a bachelor's degree and had amassed 27 hours towards a *graduate* degree, the HRC modified Finding of Fact No. 3 accordingly.

5

pretext for unlawful discrimination, and that Difolco and Spear were disparately impacted by the Hospital's discriminatory hiring process. The court awarded Difolco and Spear damages and ordered the Hospital to pay their attorney fees and costs.

**STANDARD OF REVIEW**

¶10 The Montana Administrative Procedure Act (MAPA) governs proceedings before the HRC. *Blaine Cnty. v. Stricker*, 2017 MT 80, ¶ 16, 387 Mont. 202, 394 P.3d 159. Courts review the HRC's decision under MAPA, which prohibits reviewing courts from substituting their own judgment "for that of the agency as to the weight of the evidence on questions of fact." Section 2-4-704(2), MCA. A court may reverse the agency under MAPA if the appellant's substantial rights have been prejudiced because, applicable here, "the administrative findings, inferences, conclusions, or decisions are . . . clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record [or] arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion . . . ." Section 2-4-704(2)(a)(v), (vi), MCA. This standard governs "both the District Court's review of the agency's decision and this Court's subsequent review of the District Court's decision." *Blaine Cnty.*, ¶ 16 (citation omitted).

**DISCUSSION**

¶11 The Montana Human Rights Act (MHRA) prohibits employers from discriminating against current or prospective employees because of their sex. Section 49-2-303(1), MCA; *Mont. State Univ.-N. v. Bachmeier*, 2021 MT 26, ¶ 27, 403 Mont. 136, 480 P.3d 233; *see also Thompson v. Bd. of Trs.*, 192 Mont. 266, 270, 627 P.2d 1229, 1231 (remarking that

6

§ 49-2-303(1)(a), MCA, is a "strongly worded directive[] from the legislature prohibiting employment discrimination and encouraging public employers to hire, promote and dismiss employees solely on merit."). The MHRA prohibits sex discrimination in the "term[s], condition[s], or privilege[es] of employment," including job application procedures, hiring decisions, and awarding promotions. Section 49-2-303(1)(a), MCA; Admin. R. M. 24.9.604(2) (1996).

¶12 To establish a prima facie case of discrimination, the charging party must prove that (1) they were a member of a protected group, (2) they applied for and were qualified for the position, (3) the employer rejected them, and (4) the position remained open. *Mont. Rail Link v. Byard,* 260 Mont. 331, 344, 860 P.2d 121, 129 (1993) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S. Ct. 1817, 1824 (1973)); Admin. R. M. 24.9.610(2)(a) (1996). Both the HRC and the District Court concluded that Spear and Difolco successfully established prima facie cases of discrimination. This determination is not at issue on appeal.

¶13 Once the charging party establishes a prima facie case of discrimination, the burden of production shifts to the employer to produce evidence that it had a legitimate, nondiscriminatory reason for its hiring decision. *Mont. Rail Link*, 260 Mont. at 344, 860 P.2d at 129 (citing *McDonnell Douglas Corp.*, 411 U.S. at 802, 93 S. Ct. at 1824); Admin. R. M. 24.9.610(3) (1996). Because the charging party has the burden of persuasion throughout the analysis, the employer rebuts the charging party's prima facie case if it sets forth some legitimate reason for its decision. *Mont. Rail Link*, 260 Mont. at 344, 860 P.2d

7

at 129 (citing *McDonnell Douglas Corp.*, 411 U.S. at 802-03, 93 S. Ct. at 1824-25). The charging party may prevail by proving, by a preponderance of the evidence, that the employer's proffered reason is mere pretext for unlawful discrimination. *Johnson v. Bozeman Sch. Dist.*, 226 Mont. 134, 140, 734 P.2d 209, 213 (1987) (citing *McDonnell Douglas Corp.*, 411 U.S. at 805, 93 S. Ct. at 1826). This burden merges with the employee's ultimate burden of proving that the employer intentionally discriminated against them. *Johnson*, 226 Mont. at 140, 734 P.2d at 213 (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256, 101 S. Ct. 1089, 1095 (1981)).

¶14    The Hospital challenges the District Court's determination that Findings 23, 29, 84, 92, and 94 were clearly erroneous. The Hospital alleges that the District Court reweighed the evidence, leading it to erroneously conclude that the Hospital's proffered reasoning for hiring Martin was pretext for discrimination. Spear and Difolco respond that the District Court properly found error in the findings and correctly reversed the HRC's decision.

¶15    When determining whether substantial credible evidence supports a hearing officer's findings, the reviewing court views the evidence in the light most favorable to the prevailing party. *Blaine Cnty.*, ¶ 26. The court does not ask whether evidence exists to support different findings. *Cotton v. Mont. Dep't of Corr.*, 2024 MT 278, ¶ 19, 419 Mont. 167, 559 P.3d 824. "Substantial evidence is evidence that a reasonable mind might accept as adequate to support a conclusion." *Blaine Cnty.*, ¶ 26 (quoting *State Pers. Div. v. Dep't of Pub. Health & Human Servs., Child Support Div.*, 2002 MT 46, ¶ 19, 308 Mont. 365, 43 P.3d 305). Substantial evidence must be more than a "mere scintilla" but may be less

than a preponderance. *Mont. State Univ.-N.*, ¶ 30. Because a hearing officer "is in the unique position of hearing and observing all testimony entered in this case . . . [, t]he findings of the hearing [officer], especially as to witness credibility, are therefore entitled to great deference." *Benjamin v. Anderson*, 2005 MT 123, ¶ 37, 327 Mont. 173, 112 P.3d 1039 (citation omitted).

¶16 If substantial evidence supports the administrative findings, a reviewing court may not disturb them. *In re Hofer*, 2005 MT 302, ¶ 21, 329 Mont. 368, 124 P.3d 1098. We thus analyze each of the Hearing Officer's contested findings to determine if they are supported by substantial evidence.

**Finding No. 23**

¶17 The Hearing Officer's Finding No. 23 states:

> Through its application process, MSH HR first screens applicants to see if they meet the minimum qualifications. Again, if the applicant does not meet the minimum qualifications, other combinations of education and experience can be considered particularly if there are a small number of applicants.

¶18 In support of this finding, the Hearing Officer considered the following exchange between counsel and Callarman regarding the Hospital's hiring process:

> Q. Would you agree with me that if a candidate does not meet the minimum qualifications, they should not advance to the interview stage?
>
> A. I would say that potentially depends on the process that is happening at the time . . . . There are at times when, when we post, the State has a, a little, like, blurb at the bottom that we can use a training assignment. So in certain cases, if you do not have qualified candidates, you do have the capability of interviewing someone who does not meet fully with the qualifications and you could consider them for what's called a training assignment, that they could meet the qualifications within a certain time period after they are hired.

Q. Because you wouldn't rely — [a]nd I believe the caveat you're referencing is one that says we will consider other forms of education and experience —

A. No.

Q. — on a case-by-case basis.

A. No.

Callarman agreed that the training assignment exception was not included in the TRM posting. But she clarified that the training assignment is distinct from the catch-all provision that Lanes applied to the TRM applicant pool. The training assignment exception, Callarman explained, is instead used in rare circumstances pursuant to State policy when there is an extremely limited applicant pool and none of the applicants can satisfy the minimum qualifications. Foy and Sich explained that, on the other hand, the Hospital frequently includes the "other combinations" catch-all in its job postings because it has a limited applicant pool and needs latitude to fill key positions. Despite Lanes's oversight in the posting, the Hearing Officer remarked that the catch-all gave the Hospital discretion to advance Martin, Spear, and Difolco to the interview stage.

¶19 The District Court concluded that Finding No. 23 was erroneous. It relied on Callarman's testimony to find that the catch-all provision applied only if *none* of the applicants meet the minimum qualifications. The court reasoned that Spear and Difolco met the minimum qualifications and therefore the Hospital should not have applied the catch-all provision to qualify Martin for an interview. The Hospital argues that the court relied on an erroneous interpretation of Callarman's testimony to reach its conclusion.

¶20    Callarman testified that the Hospital utilizes the training assignment exception, not the "other combinations" catch-all, in the rare circumstance that there are *no* qualified applicants for a position.  The Hospital applies the catch-all provision so that, in its discretion, it may interview applicants who are minimally qualified with or without considering the catch-all.  The Hearing Officer's Finding No. 22, which the parties do not contest, reflects this distinction, reading:

> Due to the limited applicant pool in the communities surrounding Warm Springs, where MSH is located, most job notifications contained a catch-all provision that allowed HR to consider an applicant's experience and education that are not part of the minimum qualifications on a case-by-case basis.  The inclusion of this catch-all provision allowed MSH to open the interview pool to more applicants who may have not met the minimum qualifications stated in the job posting.

Based on the above testimony and Finding No. 22, a reasonable factfinder could find that the catch-all provision granted the Hospital flexibility to expand its pool of candidates by considering individuals who did not meet the rigid minimum qualifications—even if there were qualified applicants in the pool.  Substantial evidence supports the Hearing Officer's finding that the Hospital uses the catch-all as an *alternative* basis for applicants to satisfy the minimum qualifications, and therefore Martin, Spear, and Difolco all properly advanced to the interview stage.  The District Court's misapprehension of Callarman's testimony that the training assignment exception was analogous to the catch-all provision was clearly erroneous in light of the substantial evidence in the record.

**Finding No. 29**

¶21    The Hearing Officer's Finding No. 29 provides:

11

Performance in the interview is a major component in determining who should be selected for the position. An interview is critical in the decision-making process as it allows the applicant to demonstrate their knowledge, skills, and abilities.

¶22 During the hearing, members of the hiring panel testified that they asked applicants behavioral-based questions about their experience mentoring others, working with a team, managing interpersonal conflict and competing priorities, and analyzing and evaluating treatment strategies. Callarman testified that an applicant's interview performance is important because "as much as the application can on paper demonstrate the minimum qualifications, the interview is their opportunity to demonstrate how they are able to apply that knowledge . . . ." Callarman explained that the hiring panel wanted to determine if the candidates possessed the "soft skills" in leadership and management that the TRM position required. Foy echoed this testimony, stating that an applicant's "skills, knowledge, and education related to recreation rehabilitative services" are hard skills that the Hospital can teach, whereas it cannot teach management skills. Callarman said that the interview panel asked all five applicants the same questions and that behavior-based questions are standard in the human resources industry "based on the concept that past behavior predicts future performance."

¶23 The District Court found that the Hospital's interview process for the TRM position was inherently flawed, rendering Finding No. 29 clearly erroneous. The court explained:

> The job description allocates a majority of the job duties to rehabilitative duties such as overseeing treatment plans, assigning and monitoring treatment activities, and ensuring quality patient care. Managerial duties only account for 10% of the job. The interview did not allow the Petitioners to demonstrate the knowledge, skills, and abilities in all areas that the job description required. Nor did it allow for them to talk about their education.

12

The Hospital argues that the District Court ignored witness testimony that supports Finding No. 29. Spear and Difolco respond that the court properly found the Hearing Officer's finding clearly erroneous because the interview process was entirely subjective and thus an improper assessment of whether a candidate was qualified to be the TRM.

¶24 MAPA does not grant a reviewing court authority to ignore administrative findings or to substitute its own opinion for that of the agency. *In re Hofer*, ¶ 21; *Peretti v. Dep't of Revenue,* 2016 MT 105, ¶ 18, 383 Mont. 340, 372 P.3d 447; § 2-4-704(2), MCA. The Hearing Officer found Spear and Difolco's argument that the Hospital improperly utilized a subjective interview process unpersuasive because they did not cite any human resource standard or legal precedent in support of this argument. Their argument on appeal similarly lacks support on this point. The District Court substituted its own opinion for the Hearing Officer's when it determined that the interview process was flawed because it applied subjective standards. It likewise failed to cite authority in support of its analysis. The court ignored evidence demonstrating that the interview process was modeled after industry standards and designed to ascertain whether an applicant possessed the desired skills for the position. The Hearing Officer had substantial support in the record for its finding. We conclude that the District Court abused its discretion when it reversed Finding No. 29 based on its own qualitative assessment of the Hospital's interview process.

**Finding No. 85**

¶25 The Hearing Officer found:

Following the original screening of the applicants for the TRM position, Martin, Spear, and Difolco were all initially denied interviews because none of them met the requisite minimum qualifications.

¶26 Lanes testified that, based on his review of Difolco's application materials, he believed that Difolco did not satisfy the minimum qualifications because she lacked a bachelor's degree in a related field and the required supervisory experience. Counsel confronted Lanes with Difolco's resume that declared she had a bachelor's degree in therapeutic recreation and asked, "And that's not a related field, that *is* the field; right?" (Emphasis added). Lanes responded, "I'm not going to say yes to that, because, at the time, I don't know if I would have said therapeutic recreation was exactly the same as rehabilitation therapy. Now that I've been with the hospital for two years, I probably would say that is equivalent or similar." Lanes testified that although Difolco demonstrated some supervisory and management experience on her resume, he did not believe that she possessed four years of experience in a psychiatric setting with work assignments including management of clinical area and supervision of staff.

¶27 Spear initially failed to submit her resume with her application. When she provided her resume to Lanes upon his request, he discovered that she had not updated it to reflect her position at the Hospital. Lanes testified that he believed Spear also lacked the required supervisory experience. Although she had roughly nineteen years of supervisory experience at Acadia Montana, her resume and application did not clearly indicate that her experience was in a psychiatric setting or that she had work assignments including management of clinical area and supervision of staff. Lanes rejected Martin during the

14

initial screening because he also lacked the required education and experience. Lanes emailed Foy and Sich with his rationale for rejecting the three applicants, and his email was consistent with his hearing testimony.

¶28 The District Court concluded that Finding No. 85 was not supported by substantial evidence because "[t]he evidence shows that both Spear[] and Difolco were qualified applicants. The evidence also shows that Martin did not meet the minimum qualifications." The Hospital argues that the court overlooked evidence that Spear and Difolco's TRM applications were deficient. Spear and Difolco respond that the District Court was correct and that the whole record demonstrates that Lanes was overly critical of the female applicants.

¶29 When reviewing the agency's findings, the reviewing court asks only whether substantial credible evidence supports the trier's findings and not whether the evidence could have supported a different result. *Blaine Cnty.*, ¶ 26. Lanes initially recommended that the Hospital reject Spear, Difolco, and Martin's applications, and the evidence shows that all three had errors or deficiencies in their materials. Whether Lanes erroneously determined that Spear and Difolco failed to satisfy the three original minimum qualifications is immaterial. Lanes determined that they did not, and the record shows that this was the reason he initially rejected all three applications. Lanes later recommended that all three advance to the interview stage under the catch-all provision.

¶30 "[W]hether there is evidence of intent to discriminate is a pure question of fact." *Blaine Cnty.*, ¶ 23 (citations and quotations omitted). Although a charging party does not

15

need to prove discriminatory intent to establish a prima facie case of sex discrimination in a disparate impact case, a party may prove pretext with direct evidence that the employer's hiring decision was based on an unlawful motive. Admin. R. M. 24.9.612(1), (4) (1996). There is substantial evidence to support the Hearing Officer's determination that Spear and Difolco did not prove that either Lanes's initial screening or the Hospital's decision to re-examine it and advance the remaining applicants to the interview stage was based on sex discrimination. Because Lanes's initial review produced just one qualified applicant, the Hospital exercised its judgment to expand the applicant pool and interview two male and three female candidates.

¶31 Lanes testified that he was new to his position at the Hospital at the time he screened the TRM applications. He explained that when he is going through candidates' applications, he tries "to be as careful as possible. I'm human. I was relatively new to the position, and I'm prone to mistakes just like any other person." When counsel inquired whether Lanes felt he was overly critical of Spear and Difolco's applications, Lanes replied "[a]bsolutely not," and that if he made a mistake "it was absolutely inadvertent." Lanes provided recommendations regarding which candidate advanced to the interview stage, but he testified that the hiring manager and human resources have final authority. Callarman testified that although she agreed that Martin did not satisfy the minimum qualifications without considering the catch-all, Martin's management and leadership experience in different settings likely constituted the "other combinations of education and experience" required to advance to the interview stage after the Hospital expanded the applicant pool.

16

Although Lanes acknowledged that the screening process was imperfect and that he may have made a mistake, the evidence does not support a finding that he acted with discriminatory animus when determining whether an applicant was minimally qualified.

¶32    Lanes's email and hearing testimony provide more than a scintilla of evidence to support Finding No. 85. *Mont. State Univ.-N.*, ¶ 30. The District Court improperly substituted its judgment for the agency's when it discredited Lanes's testimony and concluded that Finding No. 85 was erroneous. We therefore conclude that the District Court abused its discretion.

**Finding No. 92**

¶33    The Hearing Officer found:

> Regardless of [his inability to correct the omission of the catch-all], Lanes rescreened all the applicants considering the "other combinations" language, and passed all applicants on for interviews. This included Spear, Difolco, and Martin.

¶34    After Lanes recommended just Peterson for an interview, Sich inquired whether he included the "other combinations" catch-all provision in the job posting. Although the posting already had closed and he was unable to correct it, Lanes considered the catch-all and recommended that all five candidates proceed to the interview phase. Spear and Difolco's counsel pressed Lanes on this matter at the hearing:

> Q. You testified that you included this caveat after this email was sent, which includes the minimum education—or which includes the experience equivalency—
>
> A. Uh-huh.
>
> Q. — qualification. And then you recommended everybody for an interview?
>
> A. I did.

17

Q. And you testified that it's your job to go through these and make sure everybody is meeting the minimum qualifications?

A. Yes, sir.

Q. So after you guys recognized that we're going to include this caveat which wasn't included in the original post, do you go back in and see if everybody is qualified again?

A. On this one, yeah.

Q. And it's your testimony today that Trent Martin met those minimum qualifications even with that caveat?

A. So when it comes to the other combinations of education and experience may be considered on a case-by-case basis, unless a hiring manager is absolutely violating policy, procedure, discriminatory, doing something wrong, I let them make that decision. Because the hiring manager is the hiring manager.

Q. So essentially what you're saying is that once you include that caveat, that caveat in there, everyone qualifies for an interview.

A. No, sir.

¶35    Lanes explained that he "highly encouraged" the hiring managers to interview "anyone that may be of a similar situation . . . [who] might be a good candidate for the job but maybe they were missing one of [the minimum qualifications] . . . ." Callarman testified that adding the catch-all provision effectively allowed all applicants to receive an interview.

¶36    During the October 7 District Court hearing, the District Judge asked the Hospital how Martin qualified for an interview even considering the catch-all. Counsel for the Hospital responded, "Justin Lanes just passed all five people on for an interview . . . . So everyone was interviewed." The District Court found no evidence to support the Hearing

18

Officer's Finding No. 92. The court remarked, "In fact, during the oral arguments, [the Hospital] conceded this point and stated that the applicants were not rescreened so much as they were all just passed along to the interview stage after the caveat was found to be absent from the original job post." The Hospital argues that in reaching this conclusion, the court improperly substituted its judgment for the agency's and relied on a statement of counsel outside of the record. Spear and Difolco respond that (1) Lanes conceded that Martin did not meet any of the minimum qualifications and therefore he could not have rescreened the applicants, and (2) the hiring manager made the final decision as to who received interviews.

¶37 We first address Spear and Difolco's assertion that Lanes conceded that Martin did not meet any of the minimum qualifications. The portion of the hearing transcript that Spear and Difolco reference to support their position misstates Lanes's testimony. Lanes agreed that Martin did not meet any of the "*three* minimum qualifications" listed. (Emphasis added). In other words, Lanes determined that Martin may qualify for an interview only after considering the catch-all, and he provided this recommendation to the hiring manager.

¶38 We recognize that the record contains conflicting evidence regarding Lanes's "rescreening" the applicants. But the agency's findings are not rendered erroneous simply because conflicting evidence exists in the record. *Benjamin*, ¶ 37. "As long as we determine that substantial credible evidence exists to support the findings of the trier of fact, we may not re-weigh the evidence, but must instead defer to the Hearing [Officer]."

*Benjamin*, ¶ 37. Lanes's testimony that he "went back to make sure all of the applicants were qualified" constitutes more than a scintilla of evidence that supports Finding No. 95. *See Mont. State Univ.-N.*, ¶ 30.

¶39 The District Court determined that this finding was erroneous in part because of counsel's statement during oral argument. The Hearing Officer's finding is supported by substantial evidence, and the court abused its discretion by assigning more weight to counsel's statement than Lanes's hearing testimony. *See* § 2-4-704(1), MCA ("The review must be conducted by the court without a jury and must be confined to the [administrative] record.").

**Finding No. 94**

¶40 The Hearing Officer's Finding No. 94 provides:

> During the interview process, it was clear that Martin performed better than Spear and Difolco in their respective interviews.

¶41 The Hearing Officer concluded that the Hospital had "articulated a legitimate, non-discriminatory basis for its decision to hire Martin over Spear and Difolco."

¶42 Callarman, Sich, and Foy interviewed applicants for the TRM position. They testified that overall, Martin outperformed Spear and Difolco. Callarman's interview decision sheet noted that Martin "[d]emonstrated managerial and leadership maturity in responses. Showed strong knowledge of hospital-based programming. Showed team orientation." Sich testified that although Martin had weaker responses regarding hospital-based programming, he demonstrated strong supervisory competence. Foy agreed and remarked that Martin supported his responses with strong examples. Foy recalled that

20

Martin required his staff to take a behavioral assessment in a previous role to assess their strengths and weaknesses. The panel members said that Spear and Difolco struggled to articulate leadership skills and gave hesitant or vague answers. After the interviews, the panel discussed the merits of each candidate and unanimously recommended that the Hospital hire Martin for the TRM position.

¶43 The District Court found Finding No. 94 erroneous. The court reasoned that "there is conflicting evidence regarding Martin's knowledge of hospital based programming which does not make it clear that Martin outperformed [Spear and Difolco] in the interview." The Hospital argues that the court erred because it cannot reverse a hearing officer's finding based on the existence of conflicting evidence. Spear and Difolco argue that the court acted properly because the Hospital changed its justification for hiring Martin. First, in its response to their complaint, the Hospital said that Martin was the best qualified candidate for the position based on objective criteria. At the hearing, the Hospital focused solely on Martin's interview performance.

¶44 The Hospital's alleged change of focus to Martin's interview performance is consistent with the Hospital's initial response that Martin was the best qualified candidate. The interviewers consistently testified that Martin displayed stronger leadership and management skills than Spear and Difolco. The Hearing Officer found the interview panelists credible. He credited Foy in particular, who recalled specific examples of Martin's performance and explained that the panel prioritized "soft" skills over "hard" skills in a manager. The Hearing Officer explained that Spear and Difolco failed to prove

21

that the Hospital's justification was mere pretext because they did not present any evidence to contradict the panelists' testimony. The record supports this determination. The panel unanimously agreed that Martin received the job because of his interview performance, and Spear and Difolco failed to produce evidence that this reason was completely "unworthy of credence." *Mont. State Univ.-N.*, ¶ 53 (quoting *Bollinger v. Billings Clinic*, 2019 MT 42, ¶ 29, 394 Mont. 338, 434 P.3d 885); Admin. R. M. 24.9.612(4) (1996) (explaining that pretext can be proven indirectly with evidence that the "articulated business justification is not worthy of belief" or that the employer could have used equally effective, alternative practices that did not have discriminatory effects). Viewing the evidence in the light most favorable to the Hospital, substantial evidence thus existed to support Finding No. 94, and the District Court did not have discretion to disturb it. *In re Hofer*, ¶ 21; *Blaine Cnty.*, ¶ 26.

¶45 The court had authority to reverse the HRC's decision only if it found that the Hearing Officer's findings were "clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record." Section 2-4-702(2)(a)(v), MCA. As discussed, evidence is not rendered insubstantial merely because it is conflicting. *Benjamin*, ¶ 37. Although the court was correct that conflicting evidence exists regarding Martin's knowledge of hospital-based programming, this was an insufficient basis for its conclusion that Finding No. 94 was clearly erroneous.

**Reinstatement of the HRC's Final Agency Decision**

¶46 As discussed, we conclude that each of the Hearing Officer's challenged findings are supported by substantial evidence. Based on the applicable MAPA standards, the District Court was required to uphold those findings on judicial review. The record before the HRC, viewed in a light most favorable to the Hospital, does not substantiate a conclusion that its decision was "arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion." Section 2-4-704(2)(a)(vi), MCA. We reverse the District Court and reinstate the HRC's final agency decision in favor of the Hospital.

¶47 The District Court also awarded damages and attorney fees to Spear and Difolco. Under the Montana Human Rights Act, a hearing officer may award damages to an employee if it finds that their employer engaged in discriminatory conduct. Section 49-2-506(1)(b), MCA. The Act also grants courts discretion to award the prevailing party their attorney fees and costs. Section 49-2-505(8), MCA. Because we reinstate the HRC's determination that the Hospital did not discriminate against Spear and Difolco, we accordingly reverse the District Court's damages and attorney fees award.

## CONCLUSION

¶48 Because the administrative record contains substantial evidence to support the Hearing Officer's findings, we conclude that the District Court exceeded its authority under MAPA when it reversed the HRC. We reverse the District Court's Order and its Judgment

awarding damages and attorney fees to Spear and Difolco.  We reinstate the HRC's final

agency decision.

/S/ BETH BAKER

We Concur:

/S/ CORY J. SWANSON
/S/ JAMES JEREMIAH SHEA
/S/ INGRID GUSTAFSON
/S/ JIM RICE